After a summary hearing an injunction issued against the Washington Loan Company and the Washington Loan Company ofAtlantic City, John W.R. Doyle and his son, Charles R. Doyle, forbidding them from selling securities in this state, and especially the securities and capital stock of the two companies, and receivers were appointed for the companies, for having violated the New Jersey Securities act, laws 1927, chapter 79, as amended in 1929 by chapter 344 and in 1930 by chapter 57 and supplemented by chapter 51.
Section 2 of the act provides:
"2. The use or employment by any person, partnership, corporation, company or association of any deception, misrepresentation, concealment, suppression, fraud, false pretense, false promise or fictitious or pretended purchase or sale, in connection with the issuance, sale, offer for sale, purchase, offer to purchase, promotion, negotiation, advertisement or distribution within or from this state of any stocks, bonds, notes, debentures, evidences of indebtedness, certificates of interest or participation, interim certificates or receipts, foreign currency orders or calls or options therefor, or other instruments commonly known as secuities, hereinafter called securities, are hereby declared to be illegal practices and are hereby prohibited.
"The term `fraud,' as used in this act, in addition to the usual construction placed on it and accepted in courts of law and equity, shall include the following:
"(a) Any misrepresentation by word, conduct or in any manner of any material fact, either present or past, and any omission to disclose any such fact;
"(b) Any promise or representation as to the future which is beyond reasonable expectation or is unwarranted by existing circumstances;
"(c) The gaining of, or attempt to gain, directly or indirectly, through a trade in any security, a commission fee or gross profit so large and exorbitant as to be unconscionable and unreasonable;
"(d) Generally any course of conduct or business which is calculated or put forward with intent to deceive the public or the purchaser of any security as to the nature of any transaction or as to the value of such security;
"(e) Any artifice, agreement, device or scheme to obtain money, profit or property by any of the means hereinbefore set forth or otherwise prohibited by this act." *Page 96 
Sections 6 and 7 read:
"6. Whenever it shall appear to the attorney-general from any report or statement filed, from any examination made as provided for in this act, or from any other source, that any person, partnership, corporation, company, or association has engaged in, is engaging in, or is about to engage in, any practice declared to be illegal and prohibited by this act, he may by petition or bill of complaint setting forth the facts and circumstances of the case, apply to the court of chancery for a writ of injunction, or the appointment of a receiver, or both, and the court being satisfied by affidavit or otherwise of the sufficiency of said application and the truth of the allegations contained in the petition or bill, and upon such notice as the court may by order direct, may proceed in a summary way to hear the affidavits, proofs and allegations which may be offered on behalf of the parties, and if upon such inquiry it shall appear to the court that any such person, partnership, corporation, company or association has engaged in, or is engaging in, or is about to engage in any practice declared to be illegal and prohibited by this act, the court may issue an injunction restraining such person, partnership, corporation, company or association, and any agents, employes, brokers, partners, officers, directors and stockholders thereof, from continuing such practices or engaging therein or doing any acts in furtherance thereof, and the court may also issue an injunction restraining the issuance, sale, offer for sale, purchase or offer to purchase, promotion, negotiation, advertisement or distribution within or from this state of any securities by such person, partnership, corporation, company or association and any agents, employes, brokers, partners, officers, directors or stockholders thereof until the court shall otherwise order. In any action or proceeding brought under the provisions of this act, the attorney-general shall be entitled to recover costs and the court of chancery may also award to the attorney-general a counsel fee, said costs and counsel fee to be paid by the defendant or defendants for the use of the State of New Jersey.
"7. (a) Whenever the court of chancery shall issue any injunction provided for in section six, against a person, partnership, company or association, it may appoint a receiver with power to sue for, collect, receive and take into his possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, derived by means of any practice declared to be illegal and prohibited by this act, including also all property with which such property has been mingled, if such property cannot be identified in kind because of such commingling, and sell, convey and assign the same, and hold and dispose of the proceeds thereof under the direction of the court of chancery for the equal benefit of all who establish an interest therein by reason of the use and employment by the defendant of any practices herein declared to be illegal and prohibited; and the court shall have jurisdiction of all questions arising in said proceedings and may make such orders and decrees therein as justice and equity shall require." *Page 97 
These facts are established by the proofs annexed to the bill, and by the answering affidavits.
The Washington Loan Company was organized early in 1928 by John W.R. Doyle and his associates, through dummies, to deal in securities. The authorized capitalization at the filing of the bill was ten thousand shares of no par value. Of this John W.R. Doyle subscribed for five thousand shares, payable within three years, at $1 per share for three thousand five hundred shares, $2.50 for seven hundred and fifty shares, and $5 for the remaining seven hundred and fifty shares, and the directors resolved to sell the remaining five thousand shares to the public for $10 per share for the first one thousand, $12.50 for the second, $15 for the third, $17.50 for the fourth and $20 per share for the last thousand shares. Shares were sold for as high as $17.50 per share. Doyle paid $1 per share for three thousand five hundred shares and issued one thousand one hundred of his shares, at that rate, to sixteen, as he says, "responsible and important men in the community," where they would do the most good. He and his son now hold two thousand seven hundred and seventy-five shares for which they paid $3,337.50. The total issue of stock was seven thousand six hundred and thirty-five shares; the public holds the balance at fancy prices. The company also created a $2,500,000 eight per cent. debenture bond issue of which $160,000 has been sold to the public. The bond and stock issues are payable in installments. The cash receipts from stock and bond sales to February 28th, 1930, were $71,392.09, and all but $1,289.84 had been spent in commissions, salaries and organization and other expenses. That is what was left of the stock and bondholders' money, and it was the company's only working capital remaining. This depletion was brought about to the extent of $46,716.43 by the payment of twenty per cent. commission on sales of bonds and stocks as soon as twenty-five per cent. of the subscription to stocks and bonds was paid in, and son Charles had the commission contract.
The Doyles formed the Washington Loan Company of AtlanticCity ostensibly to engage in industrial ($300) loans. *Page 98 
Its authorized capital stock was five hundred shares at $100 per share. It had no capital; the banking department had refused it a license and it never functioned, but the Doyles used it to advantage in fostering their Washington Loan Company scheme. The Doyles, or one of them, it matters not which, agreed to purchase seventeen mortgages aggregating $99,600, face value, for $7,500 and agreed to sell them to the Washington Loan Company for $20,000 — a profit of $12,500. After the Washington Loan Company acquired the mortgages it assigned them to the Washington Loan Company of Atlantic City for three hundred and thirty-four shares of its stock at $300 a share, $100,200, and thereafter the Washington Loan Company, on its books and in statements, carried the worthless stock as an asset of $100,200 and the Washington Loan Company of Atlantic City carried the mortgages on its books as an asset of $99,600. The bogus mortgages did double service. The seventeen parcels of mortgaged land are in the Jersey pine belt, six miles from a state highway and accessible only by a narrow sand trail. The Doyles negotiated for the mortgages with one Bogatin, now under restraint for stock frauds, whose wife purchased the mortgaged lands for $50. The Doyles say they were deceived by Bogatin; that while passing the White Oak Inn, about a mile north of New Gretna, he pointed out the property to Charles, as closely adjoining the main New York and Atlantic City highway and as right back of the inn, within a stone's throw of the highway. And Doyle, Sr., explains: That he regarded the mortgages on the represented land worth the $20,000, the Washington Loan Company agreed to pay for them (although just bought for $7,500), for he contemplated putting bungalows on the land and selling the lots, if either of his companies had to buy in the land at foreclosure sale; that he had calculated he could in this manner realize the face value of the mortgages and that it was on this basis that the mortgages were carried on the books of the Washington Loan Company of Atlantic City at $99,600. This romancing is not denied, nor is it believed. It is typical of stock selling roguery. *Page 99 
The Doyles' attempt to justify the issuing of fifty per cent. of the capital stock of the Washington Loan Company to Doyle, Sr., at $1.00 per share for three thousand five hundred shares and at $2.50 and $5.00 per share respectively for the two remaining blocks of seven hundred and fifty shares each, and sales of like shares to the public for as high as $20 per share, because the Doyle-controlled board of directors, by resolution, solemnly authorized it, and authorized it at a time when the Doyles and their associates alone were stockholders; that they believed it just to those who invested in the formative period as against those who came in later, when the risk would be less, and that Doyle, Sr.'s, services in the early stages were worthy of consideration. It is open to question whether a sale to promoters of the control of a company at a nominal figure does not violate both the letter and spirit of the Corporation act relating to non-par stock (Cum. Supp. Comp. Stat. p. 686), and thus a fraud upon the statute, but that point is not presently involved. The gravamen of the bill, under the statute, is that the scheme was suppressed and the purchasing public deceived, or is intended to be misled. That it was rank fraud to take from uninformed as high as $17.50 per share, for a share worth no more than the dollar the Doyles paid is not debatable and that that was done is admitted by the Doyles. They say, there was no intentional
concealment or suppression of the facts, and that "men prominent in the business and governmental affairs of their respective communities," like the night police court judge of Atlantic City, were original $1 purchasers and later paid $10 per share, and that of the three hundred and sixty-one subscribers of stock and debenture, three hundred and seven are directors and officers of banks, trust companies and building (and loan) associations of the state. The Doyles say it was their policy to select local financiers. As victims, or as bait or lure — these bankers who sent in the names of over three hundred prospects? They say that at least seventy-five stockholders knew of the different rates at which the stock was sold, but what of the other two hundred and eighty-six? *Page 100 
And as to the seventy-five, some of whom purchased at lower rates, as low as $1 a share, and later paid $17.50, what was the inducement? And what was held out to those of the two hundred and eighty-six who bought at high rates? Surely it was not the company's financial condition, for it had no assets. It had a paper surplus of $20,000 by including among its assets the worthless stock of the Washington Loan Company of Atlantic City
at $100,200. This item omitted, it was short $80,000, used up in commissions, salaries and organization expenses as already told. Its only other prominent paper asset was the installment payments due on stocks and bonds purchased by the public. "$147,037.47," against which there was a fixed liability to the purchasers of $231,527.50; again demonstrating the $80,000 shortage.
The Doyles circulated a financial statement of the Washington Loan Company which carried as an asset the worthless three hundred and thirty-four shares of the Washington Loan Company ofAtlantic City (face value $33,400) at $100,200. That it was false is conceded. That it was innocently issued, as they plead, is not true. They say it was not sent to prospective
purchasers, but only to those who had previously purchased stock. They were prospects for more. The misrepresentation of this false asset, by the statement or previously in some other form, may account for sales of shares to them at top prices. The Washington Loan Company was a swindle and the Washington Loan Company ofAtlantic City was used to further its fraudulent impositions.
It was urged that the Washington Loan Company of AtlanticCity was not culpable because none of its stock was sold or offered for sale to the public; that its total issue of three hundred and thirty-four shares was to the Washington Loan Company, which knew of the fraud and was not deceived. To give this sanction would open the way wide to every crooked company to escape the statute. Notice of a fraudulent issue of stock, available to a co-swindler for sale, pledge or to obtain a false credit, as in the present case, would furnish immunity from prosecution. The loop hole is not in the statute. The act is comprehensive in its reach for the *Page 101 
evil it strikes at and it pertinently denounces as illegal any fraud, any false pretense or any fictitious or pretended purchases or sale in connection with the issuance * * * negotiation or distribution * * * of any stocks; and any corporation which has engaged in, is engaging in or is about to engage in any of the practices declared to be illegal is subject to restraint. The fraudulent issue of the three hundred and thirty-four shares for the spurious mortgages, without more, falls directly within the letter and spirit of the practices denounced by the act as illegal and alone justifies an injunction.
The Washington Loan Company of Atlantic City was also guilty of participating in the fraudulent sale of stock by the Washington Loan Company, by giving the latter's stock a false credit standing by means of which purchasers were deceived. The mischief aimed at by the statute is the vicious practice of cheating in securities, and the statutory sweep includes all who participate in the deception. The relief under the statute is not only an injunction restraining the particular practices complained of, but the court "may also issue an injunction restraining the issuance, sale, offer for sale, purchase or offer to purchase, promotion, negotiation, advertisement or distribution within or from this state of any securities by such person, partnership, corporation, company, or association and any agents, employes, brokers, partners, officers, directors or stockholders thereof until the court shall otherwise order." The legislature intended that the court should not only stop the fraudulent practices under investigation, but as well suppress the swindlers and swindling companies by enjoining them from further dealing in any securities in this state. A less drastic injunction — one directed against fraud in a definite stock would simply mean to these dextrous operators a shift to another company — as easily accomplished as changing their hats.
The Washington Loan Company of Atlantic City, the Washington Loan Company and the two Doyles formed the crew of violators of the Securities act and alike come under the ban of the statute. *Page 102